UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

JOSE SANCHEZ,

                              Plaintiff,                    **MEMORANDUM & ORDER**
                                                           14-CV-1008 (MKB)

               v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security*
*Administration*,

                              Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiff Jose Sanchez commenced the above-captioned action seeking review pursuant to

42 U.S.C. 405(g) and 1383(c)(3), and an order vacating the decision by the Commissioner of

Social Security ("the Commissioner") denying Plaintiff's claim for Social Security disability

insurance and Supplemental Security income benefits.  Defendant moves for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the

decision of the Administrative Law Judge Lori Romeo (the "ALJ") is supported by substantial

evidence and should be affirmed.  (Comm'r Mem. in Support of Mot. for Judgment on the

Pleadings ("Comm'r Mem."), Docket Entry No. 19.)  Plaintiff cross-moves for judgment on the

pleadings, arguing that the ALJ's determination that there were sufficient jobs in the national

economy that Plaintiff could perform was not supported by substantial evidence in the record.

(Pl. Mem. in Support of Cross-Mot. for Judgment on the Pleadings ("Pl. Mem."), Docket Entry

No. 21.)  Plaintiff argues that remand for the sole purposes of calculation of benefits is the

appropriate remedy.  (Pl. Mem. 16.)  The Court heard oral argument on July 7, 2015.  For the

reasons set forth below, Defendant's motion for judgment on the pleadings is granted in part and

denied in part. Plaintiff's cross-motion for judgment on the pleadings is granted in part and denied in part.

## I. Background

Plaintiff is a 56 year-old man with an eleventh grade education. (R. 81, 92.) Plaintiff initially filed for disability benefits on March 2, 1983, claiming that he became eligible for benefits due to injuries from a motor vehicle accident that occurred on the Long Island Expressway, (R. 359–60), with an onset date of September 22, 1982, (R. 486). Plaintiff has little to no use of his left arm, suffers from asthma, seizures and foot pain, and experiences depression. (R. 85–86, 487–88, 498.) Prior to the accident, Plaintiff was an unskilled worker.

### a. Procedural background

This case has a long and complex procedural history, recounted briefly here to the extent necessary to decide the instant motions. Plaintiff initially applied for Social Security Disability Insurance Benefits ("SSD") and Supplemental Security Income Disability Benefits ("SSI") from the Social Security Administration ("SSA") on March 2, 1983. (R. 572.) The SSA denied Plaintiff's application, and Plaintiff subsequently filed seven additional applications for SSI between 1986 and 1994, all of which were initially denied and denied on reconsideration. (R. 571–72.) On February 7, 1995, Plaintiff sought to reopen his case pursuant to the settlement agreement in *Stieberger v. Sullivan*, 801 F. Supp. 1079 (S.D.N.Y. 1992), for review and adjudication of his SSD and SSI applications from May 1, 1992 onward.[1] (R. 498.) After

---

[1]  *Stieberger v. Sullivan*, 801 F. Supp. 1079 (S.D.N.Y. 1999), *modifying* 729 F. Supp. 1376 (S.D.N.Y. 1999) involved a settlement agreement in a class action lawsuit, pursuant to which certain class members with claims for disability benefits that were denied after October 1, 1981 were able to reopen their claims for *de novo* review by the SSA. (*See Sanchez v. Astrue*, No. 07-CV-4887, slip op. at 1 n.1 (E.D.N.Y. Apr. 20, 2010), *available at* R. 498–502; *see also* R. 483.)

reopening, Plaintiff's claims were denied both in the first instance and on reconsideration, on March 2, 2000. (R. 50–51.) On March 26, 2000, Plaintiff requested a hearing before an Administrative Law Judge. (R. 20.) On December 4, 2002 and January 22, 2003, Plaintiff, represented by counsel, appeared and testified before Administrative Law Judge Eileen Burleson ("ALJ Burleson"). (R. 329–68.) On July 2, 2003 ALJ Burleson found that Plaintiff was disabled within the meaning of the Social Security Act beginning on February 4, 2000. (R. 16–32.) ALJ Burleson granted Plaintiff's application for SSI as of February 4, 2000, but denied Plaintiff's claim for SSD.[2] (R. 21.) The Appeals Council denied review on August 20, 2004, (R. 6–7), and, in 2004, Plaintiff appealed to the district court for the first time, *see Sanchez v. Comm'r of Soc. Sec.*, No. 04-CV-4594 (E.D.N.Y. filed Oct. 19, 2004).

By Stipulation and Order endorsed on February 14, 2005, the action was remanded for further administrative proceedings. *See id.* On June 28, 2005, the Appeals Council affirmed the finding that Plaintiff had been disabled since February 4, 2000, and vacated ALJ Burleson's determination as to the question of his disability prior to that date. (R. 392.) The Appeals Council found that the record reflected that Plaintiff's arm was injured prior to February 4, 2000, and directed the Administrative Law Judge to give further consideration to the severity of Plaintiff's condition for the period prior to February 4, 2000. (R. 393.) A supplemental hearing was held on January 19, 2006. (R. 421–70.) On February 24, 2006, Administrative Law Judge

---

[2] SSD benefits are unavailable unless the claimant was disabled at the time he met insured status requirements. *See Karabinas v. Colvin*, 16 F. Supp. 2d 206, 213 (W.D.N.Y. 2014) (citing 42 U.S.C. § 423(c), 20 C.F.R. §§ 404.130, 404.315(a) for SSD insured status requirements); *Baron v. Astrue*, No. 11 CIV. 4262, 2013 WL 1245455, at *17 (S.D.N.Y. Mar. 4, 2013) ("[A] claimant must 'demonstrate that she was disabled as of the date on which she was last insured.'" (quoting *Behling v. Comm'r of Soc. Sec.*, 369 F. App'x 292, 294 (2d Cir. 2010))) *report and recommendation adopted,* 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013). According to the September 25, 2012 ALJ decision, Plaintiff met the disability insured status requirements for SSD through March 31, 1986. (R. 483, 486.)

Vecchio ("ALJ Vecchio") denied Plaintiff's claim for the period of May 1, 1992 through February 3, 2000, the period in review, finding that he was capable of light work and that there were light and sedentary jobs that existed in the national economy that Plaintiff could perform. (R. 377–88.) On September 1, 2007, the Appeals Council denied review of Plaintiff's appeal, making the February 24, 2006 decision the final decision of the Commissioner. (R. 369–70.) In 2007, Plaintiff appealed to the district court for a second time, and, on April 20, 2010, the action was remanded because the court determined ALJ Vecchio's decision was not supported by substantial evidence. (R. 498–502.)

The Appeals Council vacated the February 24, 2006 decision and remanded the case to Administrative Law Judge Romeo ("ALJ Romeo") on May 17, 2010, for proceedings consistent with the district court's April 20, 2010 decision. (R. 503–05.) A second supplemental hearing was held on December 12, 2011, concerning the period of May 1, 1992 through February 3, 2000. (R. 618–71.) Following an exchange of interrogatories with a vocational expert, (R. 591, 596–601, 616–17, 494–95), on September 25, 2012, the ALJ denied Plaintiff's application, (R. 480–95.) The Appeals Council refused to review the action on October 16, 2013. (R. 474–77.) Plaintiff filed the instant action on February 18, 2014, claiming that ALJ Romeo's decision as to the period from May 1, 1992 through February 3, 2000 is not supported by substantial evidence.

### b. December 4, 2002 and January 22, 2003 hearings

ALJ Burleson held hearings on December 4, 2002 and January 22, 2003. (R. 328–68.) Plaintiff's testimony commenced on December 4, 2002 and continued on January 22, 2003, with the assistance of a Spanish interpreter. (R. 331, 355.) At the January 22, 2003 hearing, vocational expert Edna Clarke also testified. (R. 331.)

### i. Plaintiff's testimony

Plaintiff was born on November 19, 1958 in Puerto Rico, and has lived in New York since 1970. (R. 357.) He last worked in 1982, making sculptures and statues with mold and casting for a large company. (R. 335.) The heaviest statue or part of statue that Plaintiff had to carry in his job was approximately fifty pounds. (R. 549.)

Plaintiff testified that he was in a motor vehicle accident on September 22, 1982, as he was riding in a car on the Long Island Expressway on his way to work. (R. 358–60.) Plaintiff was transported to the hospital, where he remained for two weeks before he signed himself out and checked in to Lutheran Hospital. (R. 360–61.) At Lutheran, Plaintiff underwent surgery. (R. 361.) According to Plaintiff, the accident caused injury to his head and his hand, and he began to have seizures and asthma. (R. 360.) He also eventually needed surgery on his feet. (*Id.*) Plaintiff has not worked since the accident. (R. 335.)

At the time, Plaintiff lived with his mother, brother and nephew. (R. 334.) He testified that his mother takes care of the cooking, and that he does none of the shopping, cleaning, or "anything of that nature." (R. 337.) Plaintiff spent the majority of his time at home, reading magazines and watching television. (*Id.*) His mother hired a car service for him to attend doctors' appointments at Long Island College Hospital every two weeks. (R. 337–38.) Plaintiff testified that he began receiving treatment from Long Island College Hospital in the 1990s. (R. 361.) He continued to go to his doctors' appointments regularly, with a seizure specialist, a foot specialist, and a "regular" doctor, and to take Dilantin to control his seizures. (R. 365, 338.)

Plaintiff complained of seizures, chronic asthma, "a problem in [his] feet" and his "dead [left] arm." (R. 340.) According to the testimony, Plaintiff had seizures often, but could not recall the last time he had a seizure. (R. 339.) When one occurred he would typically lay on the

floor and his mother would help him get to the emergency room. (R. 339–40.) Plaintiff testified that he had recently had an asthma attack, and that he would occasionally have to go to the emergency room for the asthma. (R. 340–41.) He also could not lift his arm because "the nerve that goes down to the arm" was "cut off" in his car accident, leaving him with no strength or use of the arm. (R. 341–42.) Plaintiff had surgery in his feet for bunions, and was unable to walk more than two blocks at one time. (R. 341, 343.) He walked with a cane, which occupied his right arm so he was unable to carry anything and walk at the same time. (R. 341–42.) He also testified that the accident caused him pain in his lower back, preventing him from sitting more than thirty minutes at a time. (R. 544–45.)

### ii. Vocational expert's testimony

Edna Clarke testified at the hearing as the vocational expert. (R. 548.) Dr. Clarke described Plaintiff's work as a mold maker as medium work, in accordance with Plaintiff's description of how he performed the job. (R. 350.) All agreed that Plaintiff had no past relevant work experience in the last fifteen years. (*Id.*) ALJ Burleson described a hypothetical person to Clarke, based on the same age, education and work experience as Plaintiff. (R. 350–51.) The hypothetical involved an individual with the following description:

> He would be limited to a sedentary level work. He would further be limited to working in a non polluted with fumes, dust, gases environment. He needs to avoid physical activity with his left upper extremity and he needs safety precautions. In other words, he cannot operate machinery or he cannot work at heights.

(R. 351.) Clarke could not identify any job that would fit into the limitations provided in the hypothetical. (*Id.*)

### c. January 19, 2006 hearing

On January 19, 2006, following appeal to and remand from the district court and remand

from the Appeals Counsel, ALJ Vecchio held a supplemental hearing to determine whether from the period of May 1, 1992 through February 3, 2000, Plaintiff was disabled within the meaning of the Act. (R. 423.) Plaintiff, medical expert Dr. Harold Renacke, and vocational expert Miriam Greene[3] all testified. (R. 424.)

### i. Plaintiff's testimony

At the time of the hearing, Plaintiff continued to live with his mother, brother and nephew. (R. 426–27.) He was still not working, and testified that he had been out of work during the period of May 1, 1992 through February 3, 2000. (R. 427.) When asked what kept him from being able to work, Plaintiff responded that in his left arm, "all [the] nerves got cut in the car accident [and were] destroyed." (*Id.*) Plaintiff testified that he had surgery to repair his arm, but the doctor informed him that it was going to stay "like that" for life because the nerves in the arm were destroyed. (*Id.*)

Plaintiff also testified that he suffered from depression and needed surgery on his feet. (R. 428–29.) From May 1, 1992 through February 3, 2000, he was not able to walk outside because he could not find properly fitting shoes given the "big bone coming out of [his] foot." (R. 441.) He could not walk for an hour at a time, and could only stand "sometimes." (*Id.*) He testified that he could only lift five to ten pounds with his right arm without losing his balance. (R. 442.)

Plaintiff recalled that his seizures could "happen any time," and in October of 1991, they caused him to fall out of bed and cut his chin. (R. 450.) Plaintiff was drinking at the time. (*Id.*) He gave up alcohol in 1996 and started taking Dilantin, and he did not have seizures frequently after that. (R. 451.) Plaintiff would also suffer asthma attacks every two to three months. (R.

---

[3] Ms. Greene was identified in the transcript as "Marion Greene." (*See* R. 424.)

452.)

Plaintiff testified that prior to his work as a molder and caster, he operated a silk screen press. (R. 445.) He would carry one five-gallon paint can each day to the screen. (R. 445–46.) He did this for approximately two years. (R. 446.) Prior to that, he worked as a t-shirt screen printer, for about two to three years, and prior to that he was a pizza delivery person. (R. 446–47.)

### ii.    Medical expert's testimony

Dr. Harold Renacke, a board-certified doctor of internal medicine, reviewed the exhibits admitted into evidence at the hearing and testified as a medical expert. (R. 430.) At the time of his testimony, Dr. Renacke had not examined Plaintiff. (*Id.*) He observed that Plaintiff was examined on September 22, 1987 for an injury involving his upper left extremity, sustained on September 22, 1982 when his vehicle was struck by another. (R. 431.) Dr. Renacke testified that, at the time of the examination in 1987, Plaintiff had a history of paralysis in his left upper extremity, but reported no history of seizures as of that date. (R. 431–32.) After reviewing the findings from the September 22, 1987 examination, Dr. Renacke concluded that a palsy of the brachial plexus would result in weakness and near- paralysis of Plaintiff's deltoid muscle, but noted that there was no comment about any problem with the use of Plaintiff's fingers or left hand. (R. 432–33.) Dr. Renacke also noted that Plaintiff was treated at Long Island College Hospital from 1994 through November 8, 2002 and diagnosed with "post-traumatic left arm neuropathy," bronchial asthma and seizure disorder. (R. 433–34.) He observed that the problems with Plaintiff's feet were not originally mentioned following the motor vehicle accident, and appeared to have developed later. (R. 434.)

Dr. Renacke reviewed the status of each of Plaintiff's other impairments in the relevant

time period.  He testified that Plaintiff's January 27, 1994 admission to Long Island College Hospital appeared to coincide with heavy drinking on Plaintiff's part, and noted that the electroencephalogram ("EEG") examination at the time was "somewhat abnormal, but not abnormal for a seizure disorder."  (R. 437.)  He also testified that subsequent EEGs performed within the timeframe showed "electroform spikes."  (*Id.*)  He opined that the seizures were well controlled by medication.  (R. 437–38.)  Dr. Renacke also testified that there was no record of emergency room visits or hospitalization for Plaintiff's bronchial asthma.  (R. 438.)  The records indicated complaints and wheezing, but Dr. Renacke characterized the asthma as "mild to moderate."  (*Id.*)  Dr. Renacke also noted a February 24, 2003 psychiatric examination by Dr. Renee Davis, who concluded that Plaintiff had "an adjustment disorder whereas [*sic*] depression [and] he had alcohol dependence in remission."  (R. 439.)  Under the circumstances, Plaintiff would be able to function in a work setting.  (*Id.*)

When asked if Plaintiff's condition met any of the listings set forth in the Social Security Regulations, Dr. Renacke testified that it did not.  (R. 439–40.)  He testified that the record was insufficient to determine whether Plaintiff was unable to walk or stand for an hour at a time during the relevant time period, given his foot problems.  (R. 440.)  There was one note dated December 29, 2000 that indicated Plaintiff had a "collasity" in his right lower extremity which made it painful for him to walk.  (R. 447.)

### iii.  **Vocational expert's testimony**

Vocational expert Miriam Greene described Plaintiff's work as a molder and caster as medium, semi-skilled work with an SVP[4] level of three, given that Plaintiff was working with

---

[4]  "SVP stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job." *Urena-Perez v. Astrue*, No. 06-CV-2589, 2009

metals.  (R. 454–55.)  She described Plaintiff's work as a silk-screen operator as light work with an SVP level of three, and his job as a delivery person as light work with an SVP level of two. (R. 456.)  Greene testified that Plaintiff could not perform his past relevant work as he performed it, nor as it was generally performed in the national economy.  (R. 458.)  ALJ Vecchio then described a hypothetical person to Green, based on the same age, education and work experience as the Plaintiff.  (*Id.*)  The hypothetical involved the following description:

> Assume I find this Claimant capable of work in the exertional level of light during the period in question.  Assume I find the following exertional limitations.  The Claimant can lift up to 20 pounds with [h]is right arm which is his dominant arm. . . . Claimant has no practical use of his left arm.  Assume the Claimant's . . . ability to walk and stand is limited to 20 minutes at a time.  [Also] assume the following non-exertional limitations . . . [:] internal relatively dust and allergen free environment.

(*Id.*)  Greene testified that, based on the above assumptions, the hypothetical individual could perform some "security positions where a person would be at a desk checking people's credentials when they enter an area."  (R. 459.)  This job, a "surveillance system monitor" or "[g]ate guard" was listed as sedentary at an SVP level of two.  (R. 459–60.)  Greene also testified that 1000 jobs of that kind existed in the region, given the assumed impairments, and noted that the numbers given were for government service, "but indeed there are additional jobs for private industry that use surveillance system monitors for building security purposes."  (R. 460.)  A quarter of a million jobs existed in the national economy.  (*Id.*)  Greene further testified that 5000 general security guard jobs in the region, and 100,000 jobs in the nation, could be performed with only the use of one dominant hand.  (R. 462.)  On cross-examination by Plaintiff's attorney,

WL 1726217, at *20 n.43 (S.D.N.Y. Jan. 6, 2009) (quoting Jeffrey Scott Wolfe & Lisa B. Proszek, *Social Security Disability and the Legal Profession* 163 (2002)), *report and recommendation adopted as modified*, No. 06-CV-2589, 2009 WL 1726212 (S.D.N.Y. June 18, 2009).

Greene admitted that an individual in a security guard or surveillance monitor position might lose his position if he suffered a seizure on the job. (R. 464–65.)

### d. December 12, 2011 hearing

Following a second appeal to and remand from the district court and remand from the Appeals Council, the ALJ (ALJ Romeo) held a second supplemental hearing, to reconcile the inconsistencies in Vocational Expert Greene's testimony with the definitions of surveillance systems monitor and security guard as they are defined in the Dictionary of Occupational Titles ("DOT"), which definition (1) does not include private positions, (2) requires frequent exposure to weather, and (3) requires the use of both arms. (R. 499–502, 505.) At the hearing, the ALJ heard testimony from Plaintiff and from vocational expert Andrew Vaughn. (R. 621.)

#### i. Plaintiff's testimony

Plaintiff testified that a car accident in 1982 left him with nerve damage in his left arm, and that, to date, he could not lift it. (R. 628.) He also sustained a cut on his head, and suffered memory problems following the accident. (*Id.*) Following the accident, he had headaches, which required medication, and began to suffer from seizures, which require Dilantin. (R. 631.) Plaintiff testified that the seizures make him afraid to go anywhere by himself. (R. 629.) Plaintiff also testified to having asthma, which causes breathing problems so severe that he cannot take the train. (R. 629.)

#### ii. Vocational expert's testimony

Andrew Vaughn, a vocational expert, was presented with the following hypothetical, assuming an individual with the same age, education and work history as Plaintiff:

> Assume further that the individual, during the period from May 1st of 1992 to February 3rd of 2000 could do light work except the individual could use their right dominant arm to lift and carry 20 pounds occasionally and 10 pounds frequently; and can use their

right hand to perform both gross and fine manipulations . . . without any limitations. However, they had no functional use of their left arm. Assume further that this hypothetical individual can sit six out of eight; stand or walk up to six out of eight hours; but should not stand or walk continuously for more than 20 minutes at a time. The hypothetical individual is further limited to work in which he would not be exposed to concentrated levels of dust, fumes, odors, allergens because of asthma; and must avoid unprotected heights or moving machinery because of seizure . . . .

(R. 634.) Vaughn testified that "surveillance system monitor would be an acceptable position with these limitations in mind." (R. 636.) He indicated that the job could be done with only one hand, (*id.*), and that it was available as a job in the private sector, with duties "consistent" with those described for the government sector position, (R. 637–38). Vaugh was not able to say specifically how having functional use of only one arm would reduce the number of jobs available, and noted that "getting past the interview process with noted limitations" might be an issue. (R. 638.) Vaughn testified that, at the time of the hearing, there were 79,000 surveillance system monitor jobs in the national economy and 1100 in the region. (R. 639.) He did not have numbers available for the period of May 1, 1992 through February 3, 2000. (*Id.*)

Vaughn also testified as to other jobs. He determined that security guard was not an appropriate position for the hypothetical individual described above. (R. 640.) However, two sedentary jobs were available: order clerk, which had 211,000 jobs in the national economy and 6000 jobs in the region at the time of the hearing, (R. 642); and call out operator or creditor authorizer, which had 53,000 jobs in the national economy and 2000 jobs in the region at the time of the hearing, (R. 644). Vaughn did not have job numbers available for the period at issue. (R. 643–44.) When questioned as to whether the order clerk and call-out operator or credit authorizer jobs could be performed with one hand, Vaughn indicated that it would be possible provided there was hands-free phone technology, which was available in 1992. (R. 646–47.) At the conclusion of the hearing, Vaughn agreed to obtain job numbers for 1992 through 2000. (R.

### iii. Supplemental correspondence with vocational experts

On January 17, 2012, Vaughn wrote a letter to the ALJ informing her that he was unable to provide employment numbers for her hypotheticals prior to 1999. (R. 591.) Vaughn informed the ALJ that he enlisted the assistance of Andrew Pasternak, another vocational expert with years of experience and "numerous contacts/resources" to try to find employment numbers back to 1992, but was unable to do so. (*Id.*) The ALJ sought and received consent from Plaintiff to solicit testimony from Pasternak through interrogatories. (R. 592, 594–95.)

On April 24, 2012, the ALJ sent Pasternak a vocational interrogatory listing 24 specific questions related to Pasternak's qualifications and professional opinion regarding the jobs available during the period in question. (R. 596–601.) She posed the following hypothetical to Pasternak, assuming an individual of Plaintiff's age, education and work experience:

> Assume further that the individual during the period from May 1 1992 to Feb 3 2000, could do light work — except: although the individual could use their right dominant arm to lift and carry 20 lbs occasionally and 10 lbs frequently and can use their right hand to perform both gross and fine manipulation . . . without any limitations they had no functional use of their left arm. Assume further that this individual can sit 6 hours out of an 8 hour day; stand or walk up to 6 hours in an 8 hour day but should not stand or walk continuously for more than 20 minutes at a time. The individual is further limited to work in which he would not be exposed to concentrated levels of dust, fumes, odors, allergens because of asthma and must avoid unprotected heights or moving machinery because of seizures.

(R. 598.) Pasternak marked "yes" when asked if the hypothetical individual could perform the job of surveillance system monitor, and "no" to the question of whether the job of surveillance system monitor requires the use of both hands. (R. 604.) When asked if the number of jobs as surveillance system monitor would be reduced because the individual only has functional use of one hand, he marked "no" and added "not significantly." (*Id.*) Pasternak acknowledged that

surveillance system monitor is listed as a government job in the DOT, but said that based on his "39 years of experience as a vocational rehabilitation counselor, including on-site job analysis," there were private sector surveillance system monitor jobs. (R. 604–05.) He affirmed that the requirements of a private sector surveillance system monitor position were the same as the government position. (R. 605.) He also affirmed that an individual with the hypothetical limitations could perform the positions of order clerk, DOT 209.567-104 and/or credit authorizer/call-out operator, DOT 237.367-014. (*Id.*) When asked "[i]f the positions of order clerk . . . credit authorizer/call out operator . . . or surveillance system monitor . . . are not available to the hypothetical individual, could the individual perform any unskilled occupations," Pasternak marked "yes." (R. 606.)

As an attachment to the interrogatory, Pasternak included a letter clarifying his responses to several questions regarding the number of jobs available to the hypothetical individual for the period May 1, 1992 through February 3, 2000. (R. 608–09.) According to the letter, statistics for the occupations were only archived and available for the years 1999 and 2000, and not for any earlier year. (R. 608.) Pasternak wrote that "[w]hile it might be possible to try to project backwards to the years in question, in my opinion as a Vocational Expert this would be highly speculative and the veracity of such numbers could be in question." (R. 608.) He did, however, note that in 1999 there were 3500 surveillance system monitor jobs locally and 54,400 nationally, and in 2000 there were 4021 locally and 55,200 nationally. (*Id.*) Similarly, in 1999 there were 10,780 order clerk jobs locally and 376,430 nationally, and in 2000 there were 8270 locally and 351,580 nationally. (*Id.*) In 1999, there were 2570 call-out operator jobs locally and 82,900 nationally, and in 2000, there were 2760 locally and 82,890 nationally. (*Id.*)

In response to a question asking him to explain his findings to the extent they conflict

with the DOT, Pasternak explained that pushing a control button and using a telephone does not require the use of both hands.  (*Id.*)  He concluded, based on his experience, that all three jobs can be performed with one dominant hand.  (*Id.*)

### e.    Medical evidence

Below, the Court briefly recounts the medical evidence provided for the period of May 1, 1992 through February 3, 2000, which is the only period at issue in the instant action.

### i.    Dr. Harold A. Schechter

On August 14, 1996, Dr. Harold A. Schechter, an internist in New York, examined Plaintiff and reviewed his medical records.  (R. 176–77.)  Dr. Schechter noted that Plaintiff sustained a left arm brachial plexus injury following a motor vehicle accident in September 1982.  (R. 176.)  Plaintiff underwent an operation for brachial plexus nerve repair at Lutheran Hospital in 1983, but complained that his left arm was still weak and "nonfunctional."[5]  (*Id.*)  Plaintiff stated that he developed a seizure disorder following the accident.  (*Id.*)  Plaintiff also complained of "low back disorder," frequent headaches, and chronic anxiety following the accident.  (*Id.*)  Dr. Schechter noted that Plaintiff was hospitalized at Long Island College Hospital in February of 1996 for a seizure disorder.  (*Id.*)

Dr. Schechter's examination revealed several "well healed" lacerations on Plaintiff's scalp and surgical scars present in his neck area.  (R. 177.)  Plaintiff exhibited a "dull affect" and "poor memory with difficulty concentrating."  (*Id.*)  There was marked weakness in his upper left extremity with muscle atrophy and decreased left arm biceps reflex.  (*Id.*)  Plaintiff complained of pain in his neck, spine and left shoulder on motion.  (*Id.*)  Dr. Schechter

---

[5]  A different record, from Long Island College Hospital, indicates that Plaintiff had brachial plexus surgery in 1982.  (R. 237.)

concluded that following Plaintiff's motor vehicle accident, he sustained a "permanent left brachial plexus injury," and "post traumatic seizure disorder with mild organic mental syndrome," as well as "chronic lumbosacral derangement. (*Id.*) Dr. Schechter concluded that Plaintiff was permanently disabled from his usual occupation. (*Id.*)

### ii.   Long Island College Hospital

Plaintiff sought treatment at Long Island College Hospital, starting on January 27, 1994, when Plaintiff was hospitalized following a seizure he had at home. The records provided show several follow-up appointments with various physicians at Long Island College Hospital, continuing through 1999.

### 1.   January – February 1994 admission to hospital for seizure disorder

On January 27, 1994, Plaintiff was admitted to Long Island College Hospital after having a seizure at home. (R. 106.) The examining physician diagnosed Plaintiff with alcohol-related seizures, noting that he had a history of seizure disorder since 1982, and had last taken Dilantin, his seizure medication, six months prior. (R. 108.) The physician prescribed Thiamine, Librium, and Valium. (*Id.*) He recommended routine calcium, magnesium and liver enzymes. (*Id.*) On January 28, 1994, Dr. Peddanua noted on the "patient's progress record" that Plaintiff had received intravenous Valium, Thiamine, Librium and Dilantin. (R. 109.) Dr. Peddanua ordered potassium supplements and "Dilantin therapeutic." (*Id.*) That same day, the attending physician noted that Plaintiff was "agitated," "shaky" and "diaphoretic." (R. 111.) Plaintiff was referred to psychiatry by Dr. Al Sayed Beder. (R. 116.) The "consultation report" indicated that Plaintiff was restless, tremulous, confused and irritable. (*Id.*) On January 29, 1994, the attending physician noted that Plaintiff "had an episode of seizure while in the ER." (R. 112.) Later that day, it was noted that "psych consult appreciated." (*Id.*) On January 30, 1994, at a psychiatry

follow-up, the examining physician noted that Plaintiff was anxious and needed to be reoriented by staff.

Plaintiff underwent a computed tomography ("CT") scan, EEG and chest X-ray. (R. 106, 113.) A report from the Department of Radiology indicated that, on images of Plaintiff's chest, there was "resorption of both distal clavicles suggestive of hyperparathyroidism," rheumatoid arthritis and osteolysis due to trauma, as well as "Hillsachs deformity" of the right "humeral head." (R. 119.) A CT scan of Plaintiff's brain indicated a "moderate diffuse cerebral atrophy with mild superimposed element of hydrocephalus," as well as acute sinusitis. (R. 120.) On February 3, 1994, Dr. Marlon Seliger reviewed the results of the EEG, which was performed on Plaintiff while Plaintiff was awake, drowsy, and asleep. (R. 105.) Dr. Seliger's interpretation of the EEG results was that they were abnormal. (*Id.*) He also noted that, at the time, Plaintiff had a history of seizures and alcohol abuse, and was taking Dilantin, Librium, and Thiamine. (*Id.*)

On February 1, 1994, Plaintiff underwent a neurological evaluation with Dr. Nsima-Jbuy. (R. 117–18.) The physician noted "mild ct [*sic*] facial," atrophy, wasting and weakness of the trapezius due to trauma, and weaker motor skills due to trauma. (R. 118.) On February 4, 1994, none of the examining physicians noted seizure activity, and one noted that Plaintiff would start a full dose of Tegretol after tapering off Dilantin. (R. 114.) Plaintiff was ambulating with a slow and steady gait, and no injury was noted. (*Id.*) Plaintiff was discharged on February 5, 1994 with no further seizure activity noted. (R. 106, 115.)

### 2. Other medical evidence relating to Plaintiff's seizure disorder

On May 19, 1998 and September 15, 1998, Plaintiff had follow up appointments at Long Island College Hospital at which he reported no seizure activity and continued use of Dilantin. (R. 131–33.) On September 17, 1998, Dr. Seliger interpreted a follow-up EEG performed on

Plaintiff while Plaintiff was awake and drowsy. Dr. Seliger noted that the results were abnormal and "indicative of an epileptiform potential." (R. 130.)

On December 30, 1998, February 16, 1999, May 18, 1999, August 31, 1999, and November 30, 1999, Plaintiff had several follow up appointments at Long Island College Hospital regarding his seizure disorder. The doctors noted no seizures and that Plaintiff continued using Dilantin. (R. 125–28, 139–40, 297–300.) On May 18, 1999, Dr. Seliger noted that Plaintiff was being treated for epilepsy at the Long Island College Hospital Clinic. (R. 185.) On February 2, 2000, Dr. P. Ahora noted that Plaintiff had been seen at Long Island College Hospital medical clinic since 1996 for seizure disorder, asthma, and paralysis of the left arm. (R. 182.)

### 3. Medical evidence relating to Plaintiff's other physical impairments

On October 22, 1997, Dr. King'Asia noted that Plaintiff was under the care of Long Island College Hospital for bronchial asthma, seizure disorder, and "allergic rhinitis" from 1992 through 1997. (R. 194.)

On May 5, 1998, Dr. A. Sinha noted that Plaintiff was being treated at Long Island College Hospital for left arm weakness due to trauma, seizure disorder and asthma. (R. 195.) On May 27, 1998, Plaintiff presented at the Long Island College Hospital medical clinic. (R. 141.) Notes from the visit indicate Plaintiff's history of seizures and treatment with Dilantin, his history of asthma and asthma medications, and his "s/p neck" since 1982, which resulted from a car accident and caused Plaintiff "weakness" since 1982. (*Id.*)

In January of 1999, Plaintiff underwent surgery for the "hypertrophic" scar on his face, and had follow up appointments on January 15, January 22, February 12, March 5, April 9, May 7, June 4, July 9 and October 1, 1999. (R. 311–19.)

On February 24, 1999, Plaintiff presented at Long Island College Hospital with cold-like symptoms. (R. 283.) The examining physician noted Plaintiff's history of seizures and asthma, and noted the scar on the left side of his neck from past surgery. (*Id.*) Plaintiff was diagnosed with "well controlled" seizures and remained on Dilantin, asthma, and an upper respiratory infection. (*Id.*) His asthma medication was increased and he was given a cough suppressant. (*Id.*)

On March 12, 1999 and July 14, 1999, Plaintiff saw Dr. P. Ahora, who noted Plaintiff's history of seizures and asthma, and residual left arm weakness. (R. 136–38, 280–82.) Dr. P. Ahora also verified that Plaintiff was following up at the clinic for seizures and asthma and had suffered from left arm weakness since 1982. (R. 196.) Dr. P. Ahora saw Plaintiff again on November 12, 1999. (R. 88, 134–35, 277–78.) He noted that Plaintiff presented with a history of seizure disorder, though he reported no seizures for the past five years, and trauma in 1983, and noted that Plaintiff complained of pain in his foot. (R. 134, 277.) There was no swelling or chills from fever. (*Id.*)

On November 12, 1999, Dr. Thazin Saw of Long Island College Hospital noted that Plaintiff "is unable to work because of paralysis of left arm since 1982. He also suffers from seizures disorder and asthma." (R. 183, 193.) In a similar note dated December 1, 1999, Dr. Seliger noted that Plaintiff has "severe weakness of the left arm due to an injury" which "is permanent." (R. 186.) On February 29, 2000, Dr. Seliger wrote a letter indicating that Plaintiff "has severe left arm weakness due to an injury. This is permanent. He also is treated for seizure, high cholesterol, and asthma." (R. 184.)

### iii.   Kings-M.D. Medical Services

On February 4, 2000, Plaintiff saw Dr. Babu Joseph at Kings-M.D. Medical Services.

(R. 142–51.)  Dr. Joseph noted that Plaintiff was treated for seizures at Long Island College Hospital in 1994 through 1996.  (R. 143.)  Plaintiff complained that he had three seizure attacks in the six months preceding the examination, the last of which was two weeks prior.  (R. 142.) Upon examination, Dr. Joseph observed that Plaintiff had difficulty dressing and undressing and getting on and off the examination table.  (*Id.*)  He noted an old scar on the left side of the neck and skull, though the neck was "supple, with no masses."  (*Id.*)

Plaintiff had "marked weakness" in the upper left extremity, and muscular wasting in the left deltoid muscle, left arm and forearm.  (R. 144.)  Plaintiff's fine and coarse finger dexterity were "affected" in the left hand, and he was unable to flex or supinate his left forearm.  (*Id.*)  Dr. Joseph noted that the weakness of the upper left extremity was "secondary to motor vehicle accident."  (*Id.*)  He also diagnosed Plaintiff with chest pain, bronchial asthma, seizure disorder and nervous disorder.  (*Id.*)  Plaintiff's walking was restricted due to exertional "dyspnea secondary to bronchial asthma," and carrying and lifting heavy objects was "[s]everely restricted due to marked weakness of the left upper extremity and exertional dyspnea secondary to bronchial asthma."  (R. 145.)  Plaintiff was not restricted from standing and sitting.  (*Id.*)  He was prohibited from working near heavy machinery and driving a car due to his history of seizure disorder.  (R. 415.)

### f.    The ALJ's September 25, 2012 decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "Act").  At the first step, the ALJ noted that Plaintiff has not engaged in substantial gainful activity since September 22, 1982. (R. 486.)  The ALJ next found that during the period from May 1, 1992 through February 3, 2000, the Plaintiff had severe impairments, including weakness of the left upper extremity

secondary to a motor vehicle accident, bronchial asthma, and seizure disorder. (*Id.*) Acknowledging the findings from Long Island College Hospital, including the findings of Drs. Seliger, Schecter and Joseph, the ALJ determined that the impairments were severe during the period because they caused significant limitations on Plaintiff's physical ability to do basic work activities. (R. 487.) The ALJ also determined that there was insufficient clinical documentation to support a finding of a severe impairment based on Plaintiff's foot pain or alleged mental or psychiatric condition. (R. 487–88.) Third, the ALJ determined that the impairments did not equal the severity of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1, during the period at issue. (R. 488.) The ALJ noted that "particular consideration" was paid to Listings 1.02, 3.03, and 11.14, but rejected each. (R. 488–89.)

Thus, the ALJ examined Plaintiff's residual functional capacity ("RFC") and determined that, from the period May 1, 1992 through February 3, 2000, Plaintiff was capable of light work. (R. 489.) Specifically, the ALJ found that Plaintiff could lift and carry up to 20 pounds occasionally and up to 10 pounds frequently with his right, dominant arm and could perform both gross and fine manipulation with the right hand, but had no functional use of the left arm. (*Id.*) Further, the ALJ found that Plaintiff could sit up to six hours in an eight-hour work day and could stand or walk up to six hours in an eight-hour work day, but could not do so continuously for more than 20 minutes at a time. (*Id.*) In addition, Plaintiff was restricted to work that would not entail exposure to concentrated levels of dust, fumes, odors and allergens, or require being around unprotected heights or moving machinery. (*Id.*) The ALJ determined that the medical evidence supported a finding that Plaintiff suffered wasting and atrophy in his left upper extremity. (R. 490.) She determined, however, that Plaintiff's seizure disorder was related to his long history of alcoholism, and warranted no more restriction than that he not work around

unprotected heights and moving machinery. (*Id.*) She also observed that Plaintiff was not hospitalized for his asthma, and that Dr. Khin Aung described it as "well controlled." (*Id.*) The ALJ further found that Plaintiff's complaints of head and foot pain, as well as arm pain, were not well documented for the period at issue. (*Id.*) In reaching the determination that Plaintiff maintained the RFC to perform light work, the ALJ afforded little weight to the opinion of Dr. Schechter and his conclusion that Plaintiff was permanently disabled. (R. 491.)

Next, the ALJ determined that Plaintiff could not perform his past relevant work as a cast and mold maker. (R. 491–92.) At the fifth step in her analysis, the ALJ determined that Plaintiff was 33 years old at the beginning of the period at issue and 41 years old at the end of it, and has a limited education and no transferrable job skills. (R. 492.) She concluded that, given his age, education and work experience, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed during the relevant period. (R. 492.) The ALJ relied on vocational expert Vaughn's testimony that Plaintiff would have been able to perform the jobs of surveillance system monitor, order clerk, and call-out operator or credit authorizer. (R. 492–93.) Each had an SVP of 2, was unskilled and could be learned over a period of no more than thirty days. (R. 493.)

The ALJ explained that while the description of these jobs typically requires the use of both hands, each of them could be performed with one hand. (R. 493.) Specifically, the ALJ recounted Vaughn's testimony describing the three positions and under what circumstances each could be performed with one hand. (*Id.*) The ALJ found that vocational expert Pasternak corroborated Vaughn's testimony in the interrogatories, and deferred to the experience and training of the vocational experts, and concluded that each job could be performed with one dominant hand. (R. 493–94.) The ALJ then concluded that each of the jobs existed in

significant numbers in the years 1999 and 2000.  (R. 494.)  As for the years 1992 through 1998, the ALJ concluded that at the hearing on January 19, 2006, Greene identified 1000 and 2500 surveillance system monitor jobs in the local and national economies, respectively, and concluded that it was "reasonable to deduce, since her testimony occurred over six years ago," that those numbers were based on statistics which "stretched back further in time than Mr. Pasternak's statistics."  (R. 494–95.)  The ALJ stated that it is "reasonable to conclude that [the jobs] existed in significant numbers and did not suddenly materialize as of 1999 and 2000."  (R. 494.)  Therefore, the ALJ determined that Plaintiff was not under a disability as defined in the Act from the period of May 1, 1992 through February 3, 2000, and was not entitled to SSD or SSI benefits.  (R. 495.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Substantial evidence requires "more than a mere scintilla."  *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Moran*, 569 F.3d at 112 (citation omitted).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*."  *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks

omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence."  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner.  *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'"  *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b.   Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Act.  To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The Commissioner has promulgated a five-step analysis

for evaluating disability claims.  20 C.F.R. § 404.1520.  The Second Circuit has described the

steps as follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed.  If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work.  If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations.  When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled.  However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the
> fourth step, whether the claimant possesses the residual functional
> capacity to perform her past relevant work.  Finally, if the claimant
> is unable to perform her past relevant work, the [Commissioner]
> determines whether the claimant is capable of performing any
> other work.  If the claimant satisfies her burden of proving the
> requirements in the first four steps, the burden then shifts to the
> [Commissioner] to prove in the fifth step that the claimant is
> capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d

Cir. 1996)).

### c.  Analysis

Defendant moves for judgment on the pleadings, claiming that the Commissioner's

decision is supported by substantial evidence and should be affirmed.  Plaintiff cross-moves for

judgment on the pleadings, arguing that reversal is appropriate because, in step five, the ALJ

improperly relied on the testimony of Vaughn, Pasternak and Greene to determine that there

were jobs available in the national economy for the entire period of May 1, 1992 through

February 3, 2000.  Plaintiff argues that the combined testimony of the vocational experts is

insufficient to meet the Commissioner's burden of proof.  Plaintiff further argues that remand for

the sole purpose of calculation of benefits is the appropriate remedy, given that Plaintiff's

application has been pending for more than thirty years and the Commissioner has been unable

### i. Vocational expert testimony

Plaintiff argues that the ALJ's determination at step five — that Plaintiff could perform other jobs that existed in significant numbers in the national economy — was not supported by substantial evidence. Plaintiff asserts that the testimony of vocational experts Pasternak and Vaughn regarding the availability of jobs in 2011, 2000 and 1999 was insufficient to show the availability of those jobs for the "entire relevant period." Plaintiff further argues that the testimony of vocational expert Greene at the 2006 hearing did not support a finding that the named jobs existed in the period May 1, 1992 through February 3, 2000. Because these were insufficient to provide a basis for a determination in the relevant period, Plaintiff contends that the ALJ's conclusion that the jobs must have existed during the time period is not based on substantial evidence and must be reversed.

The Commissioner contends that the vocational expert testimony constituted substantial evidence, and the ALJ properly reconciled the testimony of the vocational experts and information contained in the DOT to determine that the Commissioner satisfied her burden of proof at step five. The Commissioner further argues that "[t]he ALJ was not required to specifically acquire employment numbers for each and every year of the period at issue," and that the testimony of Greene related to the whole of the period at issue. (Comm'r Mem. 15.)

In determining whether there is substantial evidence to support the ALJ's findings, the Court must examine the entire record, including any evidence from which conflicting inferences can be drawn. *Selian*, 708 F.3d at 417. While it may be the case that the ALJ was not required to specifically obtain employment numbers for each individual year of the period at issue, the ALJ's conclusion that jobs existed in significant numbers during the period at issue must be

based on some evidence beyond the ALJ's own intuition or speculation. *See Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) (finding administrative law judge's conclusion that there were jobs the plaintiff could perform was not based on substantial evidence when vocational expert's testimony about what jobs were available turned on administrative law judge's determination that the plaintiff would have to take a six minute break every hour, which "was not based on the record [which only stated plaintiff needed to be off-task for ten percent of the work day] but was the result of the ALJ's own surmise"); *McCauley v. Astrue*, No. 08-CV-0067, 2009 WL 4891760, at *6 (N.D.N.Y. Dec. 16, 2009) (adopting report and recommendation that rejected suggestion of administrative law judge that the plaintiff's limitations, as outlined by the treating physician, were improving, noting the suggestion was "based upon mere conjecture by the ALJ, rather than actual medical evidence or opinion"); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (The administrative law judge's findings in step five, as to which jobs a claimant is able to perform must be "supported by substantial evidence, not mere intuition or conjecture.") (citation omitted). Furthermore, the ALJ is not permitted to substitute her own lay opinion for that of an expert. *Burgess*, 537 F.3d at 131.

Here, the ALJ concluded that the combination of testimony from Greene, Vaughn and Pasternak led to the "reasonable" conclusion that there was a significant number of jobs available within Plaintiff's restrictions in the relevant time period. (R. 494–95.) The ALJ determined that it was "reasonable to deduce" that Greene's testimony "stretched back further in time than Mr. Pasternak's statistics," and that it was "reasonable to conclude that [the jobs] existed in significant numbers and did not suddenly materialize as of 1999 and 2000." (*Id.*) However, there is no indication that this was in fact a "reasonable" conclusion, and the record indicates otherwise. First, Pasternak wrote that, in his expert opinion, such backward projection, "would

be highly speculative and the veracity of such numbers could be in question." (R. 608.) Second, Clarke testified in the initial hearing in 2003 that there were no sedentary jobs available for an individual with Plaintiff's limitations, (R. 351), contrary to Vaughn's testimony that Plaintiff could perform the jobs of call-out operator/credit authorizer or order clerk, a discrepancy which the ALJ did not address. Third, it is not clear from the record that Greene's testimony related to the period in question, and not merely "jobs that exist." (*Compare* R. 424 (testimony of medical expert was to be about condition "during the period in question" but testimony of vocational expert was about "whether there's any work you can perform") *and* R. 459–60 (testifying about "work that exists in the nation") *with* R. 457–58 (presenting hypothetical to Greene assuming "I find this Claimant capable of work in the exertional level of light during the period in question," asking whether he could perform his past relevant work).) Given that the evidence before the ALJ was ambiguous and equivocal, it was improper for the ALJ to substitute her own opinion as to whether there were jobs available within Plaintiff's limitations for the period prior to 1999. *See Hensley v. Colvin*, --- F. Supp. 3d ---, ---, 2015 WL 867656, at *5–6 (M.D. Fla. Mar. 2, 2015) ("Here, the vocational expert was not able to provide any more than a rough 'guesstimate' as to the relationship that the number of jobs available to plaintiff between 1990 and 1993 bore to the number of jobs available in 2012. The Court declines to find this testimony constituted substantial evidence." (citing *Wilson*, 284 F.3d at 1227)); *Belge v. Astrue*, No. 09-CV-0529, 2010 WL 3824156, at *10 (M.D. Fla. Sept. 27, 2010) (remanding to determine the basis for the vocational expert's estimation that a one-third reduction of the number of jobs available at time of hearing, in 2008, was appropriate calculation to determine the number of jobs available in 1998, noting that vocational expert testified it was difficult to "break down exactly" what the numbers were for 1998, but that to reduce by one third "would be a fair estimate of the numbers

that may have been, you know, close"); *Harmison v. Halter*, 169 F. Supp. 2d 1066, 1072 (D. Minn. 2001) (finding vocational expert's testimony which indicated that it was "kind of iffy" or "questionable" whether plaintiff would be able to function in certain positions provided "sufficient doubt as to whether a person with plaintiff's limitations would be able to perform jobs existing in substantial numbers in the national economy" and concluding that there was not substantial evidence to sustain the administrative law judge's finding because the testimony was "equivocal at best").

Furthermore, to the extent the ALJ relied on Greene's expert testimony, that testimony was challenged on Plaintiff's second appeal to the Eastern District of New York, because Greene failed to explain the conflicts between her description of the job and the description that existed in the DOT, and failed to identify where she obtained her information regarding the private surveillance system monitor job. (*See* R. 501–02.) ALJ Vecchio's decision was vacated because of the insufficiency of Greene's testimony, and as a result, Greene's testimony alone would not constitute substantial evidence. *See Corbett v. Colvin*, No. 12-CV-1294, 2014 WL 687991, at *3–4 (M.D. Fla. Feb. 21, 2014) (rejecting step five finding when administrative law judge determined forty percent reduction in current job numbers was appropriate to obtain numbers for period in question based on population information, and vocational expert agreed, but "he did not state where that 'information' came from, and there is no indication in the administrative transcript or the Decision that the population information provided by the ALJ was accurate").

The Commissioner relies on two cases to support her contention that the ALJ was justified in relying on the opinions of the vocational experts, even though they did not provide specific numbers of jobs available during the relevant time period. (Comm'r Mem. 15 (citing *Williams v. Colvin*, No. 13-CV-180, 2014 WL 1681707, at *1 (D. Vt. Mar. 31, 2014) (adopting

report and recommendation) and *LeBlanc v. Shalala*, No. 93-CV-4337, 1994 WL 24937 (5th Cir. 1994) (per curiam) (unpublished table decision)).)  The Commissioner's reliance on *Williams*, and the citing references provided, is misplaced.  *Williams* concerned the extent to which a vocational expert must identify the sources of his figures or supporting documentation to substantiate his conclusion as to the number of jobs available in the national and regional economy.  *See Williams*, 2014 WL 1681707, at *13 (report and recommendation); *see also Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 450 (2d Cir. 2012) (finding no error when the ALJ accepted vocational expert testimony, given that he "identified the sources he generally consulted to determine [the job numbers]," identified any conflict between his testimony and the DOT, and advised the ALJ of the differences and basis for his opinion); *Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008) ("The vocational expert identified the sources he generally consulted to determine such figures.  [Plaintiff] has not pointed to any applicable regulation or decision of this Court requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation."); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1218, 1218 n.4 (9th Cir. 2005) (denying Plaintiff's argument that the Federal Rules of Evidence, including expert testimony rules and case law, apply in administrative proceedings, noting that a vocational expert's recognized expertise provide the necessary foundation for his testimony regarding the number of available jobs).  Furthermore, *LeBlanc* involved a vocational expert who specifically testified that the identified jobs existed in significant numbers, something that Pasternak and Vaughn were unable to do.  *See LeBlanc*, 1994 WL 24937, at *4 ("[Plaintiff] does not point to any authority that requires a vocational expert to state specific numbers of jobs. The expert testified that the jobs existed in significant numbers.  This is substantial evidence upon which the ALJ could make his finding.").

In cases where, as here, the experts did not reach a conclusion as to the time period prior to 1999, were unable to connect the number of jobs available in 1999 to those available earlier in time, and indeed stated that any such conclusion would be based on mere speculation, it cannot be said that there is substantial evidence to support the ALJ's determination as it applies to the period from May 1, 1992 through the end of 1998. As to the period from 1999 through February 4, 2000, the Court finds that the Commissioner's decision was supported by substantial evidence.

### ii. Remand for calculation of benefits

Plaintiff contends that remand for the sole purpose of calculation of benefits is the appropriate remedy in a case such as this one, where his application has been pending for more than thirty years and "[t]here is no reason to believe that a remand would serve any useful purpose if, after all these years and after consulting four vocational experts, the Commissioner has not been able to meet her burden of proof." (Pl. Mem. 16.) At oral argument, Defendant argued that if the Court remands the case, the Court should remand for further administrative proceedings and not for determination of benefits. Defendant conceded that a brief time limit, such as 60 days, could be imposed upon the administrative proceedings, but argued that the Commissioner should be given further opportunity to search the archives for relevant data.

Generally, when a court determines that the findings of the ALJ are not supported by substantial evidence or the ALJ has applied an improper legal standard, remand is appropriate to further develop the evidence in the record. *Butts*, 388 F.3d at 385–86; *Baron v. Astrue*, No. 11-CV-4262, 2013 WL 1245455, at *19 (S.D.N.Y. Mar. 4, 2013) ("Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision." (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996))) *report and recommendation adopted*, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013).

However, if the court determines that a claimant has met his burden of showing disability at the first four steps, and the Commissioner has failed to meet her burden of rebuttal, a court may remand for further proceedings or may remand solely for calculation of benefits. *Butts v. Barnhart*, 416 F.3d 101, 104 (2d Cir. 2005) (holding that because Commissioner failed to meet her burden to provide vocational testimony about the availability of appropriate jobs, thus failing to meet burden of rebuttal at the fifth step, it was not an abuse of discretion to remand for further proceedings but noting that "order of a benefits calculation was hardly out of the question"); *Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000) (Where reversal is based solely on the Commissioner's failure to sustain his burden in the fifth step, "remand for the sole purpose of calculating an award of benefits is mandated." (citing *Balsamo v. Chater*, 142 F.3d 75, 82 (2d Cir. 1998))), *superseded by statute on other grounds, as recognized in Selian*, 708 F.3d 409; *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (remand for calculation of benefits appropriate where step five determination was not supported by vocational expert testimony, noting "we have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose"); *Fortier v. Astrue*, No. 10-CV-1688, 2012 WL 3727178, at *17 (D. Conn. May 11, 2012) (remanding for calculation of benefits when "the Court has the benefit of testimony from the vocational expert that there are no jobs existing in significant numbers in the national economy for someone with Plaintiff's limitations to perform") *report and recommendation adopted*, No. 10-CV-1688 (D. Conn. May 29, 2012) (unpublished ruling and order); *Huhta v. Barnhart*, 328 F. Supp. 2d 377, 387 (W.D.N.Y. 2004) ("The Commissioner has failed to meet her burden that plaintiff can perform other work after December 10, 1996. Accordingly, a remand solely for the calculation of benefits is warranted."). This is particularly true in cases that have been pending

for long periods of time, though "delay alone is an insufficient basis on which to remand for benefits." *Marble v. Barnhart*, No. 04-CV-4899, 2006 WL 407551, at *3 (E.D.N.Y. Feb. 17, 2006) (quoting *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996)).

Plaintiff's first application was filed more than thirty years ago, has been appealed to the district court on three separate occasions, and has been the subject of four hearings before three administrative law judges. There is little indication in the record that further testimony on the matter would prove useful in determining whether jobs existed in significant numbers during the period from May 1, 1992 through the end of 1998.[6] The Commissioner has conceded that "because the period at issue ranges from fourteen to twenty-two years ago, accurate data regarding the number of jobs available as surveillance system monitor, order clerk, and call-out operator [are] not available as data for recent years or for the present [are]." (Comm'r Mem. 14.) Because of the length of time the application has been pending and the indication that further proceedings would be of limited use, the action is remanded solely for calculation of benefits as to the period from May 1, 1992 through the end of 1998. *See Curry*, 209 F.3d at 124 (remanding for calculation of benefits when application pending for more than six years, and further evidentiary hearings and appeal could result in further delay); *Balsamo*, 142 F.3d at 82 (remanding four-year old application for calculation of benefits based on errors at step five); *Parker*, 626 F.2d at 235 (remanding for calculation of benefits, noting that Appeals Council declined review of claim because "[f]or the administrative law judge to obtain current vocational testimony on jobs [that the plaintiff] could have performed on June 30, 1976 would not be

---

[6] The Court notes that while, as Defendant argued, the ALJ is not required to obtain employment numbers for every single year, because there is specific testimony from vocational expert Pasternak that extrapolating backward would be speculative and, because there is no evidence to connect the 1999 numbers to 1992, ALJ Romeo's finding as to 1992 through 1998 is not supported by substantial evidence.

inappropriate"); *Marble*, 2006 WL 407551, at *3 (remanding ten-year-old claim, noting that "[t]hough it is within my discretion to give the Commissioner another chance to carry her burden, I believe fairness requires that I decline to do so"); *Huhta*, 328 F. Supp. 2d at 387 (finding remand for calculation of benefits warranted when Commissioner failed to meet burden at step five).

### III. Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings is granted in part and denied in part. Plaintiff's cross motion for judgment on the pleadings is granted in part and denied in part. The Court finds that the ALJ erred by failing to properly assess whether, given Plaintiff's limitations, there were jobs in significant numbers available during the time period from May 1, 1992 through the end of 1998. The Commissioner's decision is vacated and this action is remanded for computation of benefits. *See* 42 U.S.C. § 405(g); *Curry*, 209 F.3d at 124. The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: July 14, 2015
       Brooklyn, New York